## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 07-307 (PAM/JJG) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Gregory Marion Hewitt, | |
| Defendant. | |

The above-entitled matter came before the undersigned on November 15, 2007, for resolution of pretrial motions. John R. Marti, Assistant United States Attorney, appeared for the Government. Daniel M. Scott appeared for Gregory Marion Hewitt ("Hewitt"). This case has been referred to this Court for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

Before the Court is Hewitt's motion to suppress statements (Doc. No. 19). For the reasons set forth below, the Court recommends denial of Hewitt's motion.

**I.  BACKGROUND**

On October 30, 2007, Hewitt was indicted for securities and wire fraud. The indictment charged him with defrauding investors in the sale of securities. *See* Doc. No. 22.

From April 14, 2004, to December 13, 2006, Hewitt had a series of eight meetings with the FBI regarding matters now the subject of the indictment against him. Seven of these meetings occurred at the FBI's office in Minneapolis, Minnesota. The other meeting occurred at Hewitt's home. In addition to these meetings, Hewitt spoke with FBI agents over the phone, or exchanged voice mail messages with them, on numerous occasions.

### A.  Hewitt's First Meeting with the FBI

Hewitt initiated the series of meetings with the FBI by calling Special Agent Michael Winslow at the Minneapolis FBI office shortly before their first meeting. The two arranged for the meeting at the Minneapolis FBI office at 10:00 a.m. on April 14, 2004.

Hewitt arrived at the FBI's office on that day at the appointed time. Special Agent Winslow and another FBI agent, Special Agent Boylan, met Hewitt in the FBI lobby and walked with him to an interview room. They identified themselves as FBI agents and informed Hewitt that their discussion was voluntary, he could ask to leave, he could contact an attorney, he could refuse to answer any questions, and he would not be arrested that day. Special Agent Winslow repeated at numerous points throughout their discussion that their meeting was voluntary and that Hewitt could leave at any time.

Toward the beginning of the meeting, Special Agent Winslow asked Hewitt if he was represented by an attorney. Hewitt responded that he had an attorney for a civil matter related to the subject of the FBI investigation, but that the attorney did not represent him with respect to any criminal matters. Hewitt stated that he had spoken with this attorney prior to coming to the FBI, and that he had advised him to proceed with the FBI meeting.

Also toward the beginning of the meeting, Special Agent Winslow told Hewitt that if he chose to leave their meeting, the FBI would continue to investigate the matter, including contacting Hewitt's wife and children if necessary.

The April 14, 2004, meeting lasted approximately four hours. During this time, Hewitt used the bathroom once and had water and coffee. FBI agents Winslow and Boylan walked Hewitt to the

bathroom when he needed to use it and waited outside the bathroom door while he did so. Special Agent Winslow testified that they did this because non-FBI individuals cannot be in FBI space unless they are escorted by FBI personnel.

At the conclusion of the first meeting, Hewitt signed a statement regarding what he discussed with the FBI agents during the meeting. Hewitt indicated on this statement that the FBI agents had informed him at least twelve times that their meeting was voluntary. *Government's Ex. 1*, November 15, 2007, motion hearing. Hewitt was not arrested at the conclusion of the interview, and left the FBI offices on his own.

Later, on the evening of April 14, 2004, Hewitt left Special Agent Winslow a voice mail message stating that he wanted to continue to cooperate with the FBI and thanking Special Agent Winslow for allowing him to come clean.

### B. Subsequent Meetings at the FBI's Office

Following the first meeting, Hewitt met with FBI agents at the Minneapolis FBI office on another six occasions.[1] The circumstances of these meetings were much the same as the first meeting. Hewitt arrived at the FBI's office and met with FBI agents in an interview room. The agents informed him that the meetings were voluntary and that he could terminate them at his choosing. Hewitt was not arrested at the conclusion of any of these meetings, and left them on his own.

### C. Meeting at Hewitt's Apartment

On July 12, 2004, the FBI and Hewitt met at Hewitt's apartment. On that occasion, Special Agent Winslow and another FBI agent went to Hewitt's home to talk with him regarding new allegations they had

---

[1] These meetings took place on April 15, April 20, April 28, May 26, and June 28, 2004, and December 13, 2006.

received that Hewitt was continuing to defraud investors. They pressed the buzzer in the apartment building lobby, announced themselves, and Hewitt let them up. The agents told him that they wanted to ask him a few questions, and Hewitt invited them in. Hewitt led them to his home office, where they discussed the new allegations. Hewitt apologized regarding these allegations, and stated that he hoped his cooperative relationship with the FBI would not be jeopardized.

### D.     Telephone Call with Attorney Information

On July 23, 2004, Special Agent Winslow contacted Hewitt by telephone. During that conversation, Hewitt told Special Agent Winslow that he did not want to talk to him and gave him the name and phone number of his lawyer, Wayne Popham. Hewitt then terminated the phone call.

Hewitt and Special Agent Winslow subsequently met at the Minneapolis FBI office on December 13, 2006, over two years later. At that meeting, Special Agent Winslow asked Hewitt if he wanted to consult with an attorney, but did not ask him specifically about Mr. Popham.

## II.    ANALYSIS

Hewitt moves to suppress all statements, admissions, and answers made to FBI agents at the eight meetings described above. He contends that suppression is warranted because he was denied the right to counsel and did not make the statements voluntarily. The Government responds that the interviews were non-custodial and the statements voluntary.

### A.     Right to Counsel

Hewitt argues that he was denied the right to counsel in violation of his Fifth and Sixth Amendment rights. Because he was never taken into custody, and the interviews he challenges occurred well before he was criminally prosecuted, no right to counsel attached.

**1.     Fifth Amendment**

Miranda rights, including the right to be informed of and invoke representation by counsel, are triggered only when a person's freedom has been sufficiently restricted to render him "in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). In making this determination, the court considers: 1) the totality of the circumstances surrounding the questioning; and 2) whether a reasonable person in the suspect's position would have felt free to terminate the questioning and leave. *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004), *cert. denied*, 543 U.S. 1145 (2005). *See also U.S. v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) (outlining indicia of custody). This inquiry is based on the objective circumstances of the questioning, not the subjective views of the police or suspect. *LeBrun*, 363 F.3d at 720.

No Miranda warnings or the attendant right to invoke representation by counsel were required here, because Hewitt was not in custody during the meetings he challenges. Hewitt, himself, initiated the series of meetings with the FBI by calling Special Agent Winslow and asking to meet with him. Hewitt transported himself to and from each meeting at the FBI's Minneapolis office. The FBI agents told Hewitt at each interview that his participation in the meeting was voluntary, that he could leave at any time, and that he would not be arrested that day.[2] He was not, in fact, arrested at the conclusion of any of the interviews, but instead left on his own. Hewitt was not physically restrained or handcuffed. He repeatedly expressed that he wanted to cooperate with the FBI, and stated that it felt good to come clean.

Viewing the totality of these circumstances, the Court concludes that a reasonable person in Hewitt's position would not have felt restrained to the degree associated with formal arrest. Where, as

---

[2] The record reflects that at some of their meetings, the FBI informed Hewitt that his participation was voluntary at least a dozen times.

here, a suspect arrives voluntarily at the police station, is repeatedly told by officers that the meeting is voluntary and that he can leave at any time, and is not arrested at the end of the interview, the meeting is noncustodial. *LeBrun*, 363 F.3d at 722-724; *U.S. v. Black Bear*, 422 F.3d 658, 662-663 (8th Cir. 2005); *U.S. v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (lack of arrest is a "very important factor weighing against finding of custody"); *U.S. v. New*, 491 F.3d 369, 274 (8th Cir. 2007) ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody ... is for the police to inform the suspect that an arrest is not being made and the suspect may terminate the interview at will.") (citation omitted).

No different result is warranted for the July 12, 2004, meeting at Hewitt's apartment. Hewitt buzzed the FBI agents into his building and invited them into his apartment. He then voluntarily answered their questions. Hewitt stated that he hoped the new allegations against him would not jeopardize his cooperative relationship with the FBI. Hewitt's freedom of movement was not restrained during the discussion. He was not arrested at the conclusion of the interview. Nothing in this encounter suggests that Hewitt was in custody in his own home. *See Beckwith v. U.S.*, 425 U.S. 341, 347 (1976) (suspect not in custody during IRS interview in private residence); *U.S. v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) (court is less likely to find that interview is custodial where it occurs "in the comfort and familiarity of his home....").

The fact that Hewitt stated that he was represented by counsel in a civil matter during the first interview, and, on July 23, 2004, gave Special Agent Winslow the contact information for that attorney, does not change the analysis. Even assuming for the sake of argument that Hewitt unambiguously invoked the right to be represented by counsel, which is far from clear, any such invocation did not require the FBI

6

agents to cease questioning under *Miranda* where Hewitt was not in custody. *See McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991) ("We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'"). *See also U.S. v. Muick*, 167 F.3d 1162, 1165-1166 (7th Cir. 1999) (Miranda right to counsel triggered only where suspect is in custody); *Alston v. Redman*, 34 F.3d 1237, 1246 (3d Cir. 1994), *cert. denied*, 513 U.S. 1160 (1995); *Burket v. Angelone*, 208 F.3d 172, 197 (4th Cir.), *cert. denied*, 530 U.S. 1283 (2000).

### 2. Sixth Amendment

Hewitt additionally claims that the FBI's questioning implicated his Sixth Amendment right to counsel. The Court disagrees.

The Sixth Amendment right to counsel attaches "at or after the time that judicial proceedings have been initiated ... whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Fellers v. U.S.*, 540 U.S. 519, 523 (2004) (citation omitted). "The protections provided by the Sixth Amendment are explicitly confined to criminal prosecutions." *Austin v. U.S.*, 509 U.S. 602, 608 (1993). Judicial proceedings against Hewitt were initiated via a felony information filed on September 6, 2007, well after the challenged interviews occurred. Although a State of Minnesota administrative cease and desist order was pending against Hewitt prior to that time, the record does not contain any information regarding that order, including its date or the nature of the proceeding underlying it. Hewitt's Sixth Amendment right to counsel was not, therefore, implicated by the FBI's questioning.

### B. Voluntariness

Hewitt also contends that his discussions with the FBI were coerced in violation of his Fifth Amendment Due Process rights. His contention appears to be premised on a statement made by Special

7

Agent Winslow during the first interview on April 14, 2004. Towards the beginning of that interview, Special Agent Winslow told Hewitt that if he chose to leave the interview, the FBI would continue its investigation and take it wherever necessary, including to his wife and children.

"A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *LeBrun*, 363 F.3d at 724 (citation omitted). In making this determination, the Court considers the totality of the circumstances. *U.S. v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005). The government must show by a preponderance of the evidence that the defendant's statements were voluntary. *Id.*

In *Brave Heart*, the court considered whether emotional appeals regarding a suspect's family members rendered a confession involuntary. There, the police were investigating Brave Heart for the death of his infant nephew. Brave Heart told officers on the scene that his one-year-old son had hit his nephew on the head with a toy. *Id.* at 1036. During a subsequent interview, police told Brave Heart that they did not think it would be fair for Brave Heart's young son to bear the blame for the infant's death. *Id.* at 1037. The police also suggested that Brave Heart's sister-in-law (the infant's mother) could be responsible for the death. *Id.* Brave Heart then confessed. The court found that the confession was voluntary, noting that police use a variety of tactics, including "playing on a suspect's emotions," that do not necessarily render a confession involuntary. *Id.* at 1041. *See also U.S. v. Haynes*, 301 F.3d 669, 684 (6th Cir. 2002) (confession not coerced where police threatened legal action against defendant's girlfriend and daughter).

Similarly, here the totality of the circumstances do not demonstrate that Hewitt's will was overborne by Special Agent Winslow's comments. Hewitt is 57 years old and worked as a financial advisor for 25 years. He initiated the April 14, 2004, meeting with the FBI. He arrived at the meeting of his own accord.

His demeanor during the interview was calm. He was given refreshments and used the bathroom during the interview. He signed a statement at the end of the interview reflecting that the FBI told him over twelve times throughout the interview that his participation was voluntary. Later that evening, after he had left the interview, he left a voice mail for Special Agent Winslow thanking him for allowing him to come clean. While this Court does not look kindly on investigator tactics involving a suspect's family, the circumstances here clearly show that Hewitt wanted to talk with the FBI, even before the issue of his family members arose. The totality of these circumstances, therefore, do not reflect that his will was overborne.

## III.  RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** Hewitt's motion to suppress statements (Doc. No. 19) be **DENIED**.

Dated this 26th day of November 2007            s/ Jeanne J. Graham

                                                JEANNE J. GRAHAM
                                                United States Magistrate Judge

## NOTICE

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **December 18, 2007**. A party may respond to the objections

within ten days after service thereof.  Any objections or responses filed under this rule shall not exceed 3,500 words.  The district court judge shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.  Unless the parties are prepared to stipulate that the district court judge is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this report and recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.